115 T.C. No. 28


UNITED STATES TAX COURT


COGGIN AUTOMOTIVE CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1684-99.                    Filed October 18, 2000.


     P was a holding company that held over 80 percent of
the stock of five corporations (collectively, the
subsidiaries) that were engaged in the retail sales of
automobiles and light trucks conducted through six
dealerships.  From 1972 or 1973 until and including the
fiscal year ended June 26, 1993, P (as common parent)
filed consolidated corporate income tax returns with its
subsidiaries.  The subsidiaries maintained their
inventories of automobiles and light trucks under the
dollar-value LIFO method of accounting.  P did not
directly own any inventory.

     From Jan. 29, 1970 (the date of incorporation),
until June 27, 1993, P was a C corporation. On or about
Aug. 27, 1993, P elected S corporation status, effective
June 27, 1993.  The election was made pursuant to a
restructuring plan.  The restructuring resulted in the
establishment of six new S corporations formed for the
purpose of becoming general partners in six limited
partnerships that would operate the six dealerships.
Each subsidiary contributed the assets and liabilities of

its dealership to a limited partnership in exchange for a limited partnership interest. Following the transfer of assets to the limited partnerships, the subsidiaries were liquidated. As a result, P obtained the subsidiaries' limited partnership interests.

R determined that pursuant to sec. 1363(d), I.R.C., P's conversion to an S corporation triggered the inclusion of the affiliated group's pre-S-election LIFO reserves ($5,077,808) into P's income. R's primary position was that the restructuring should be disregarded because it had no tax-independent purpose. R alternatively maintained that under the aggregate approach to partnerships, a pro rata share ($4,792,372) of the pre-S-election LIFO reserves was attributable to P.

Held: The restructuring was a genuine multiple-party transaction with economic substance, compelled by business realities and imbued with tax-independent considerations. The restructuring was not shaped solely by tax avoidance features. Consequently, R's primary position that there was no tax-independent business purpose for the restructuring is rejected.

Held, further: The aggregate approach (as opposed to the entity approach) to partnerships better serves the underlying purpose and scope of sec. 1363(d), I.R.C. Accordingly, P is deemed to own a pro rata share of the partnerships' inventories of automobiles and light trucks. Consequently, upon its election of S corporation status, P was required to include $4,792,372 in its gross income as its ratable share of the LIFO recapture amount.

Sheldon M. Kay and Robert L. LoRay, for petitioner.

James P. Dawson and Julius Gonzalez, for respondent.

JACOBS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Tax Year Ended | Deficiency |
|----------------|------------|
| June 26, 1993 | $432,619 |
| Dec. 31, 1993 | 432,619 |
| Dec. 31, 1994 | 432,619 |
| Dec. 31, 1995 | 432,619 |

These deficiencies stem from respondent's determination requiring petitioner to recapture its LIFO reserves upon conversion from a C corporation to an S corporation effective June 27, 1993.

The issue for decision is whether petitioner is subject to LIFO recapture pursuant to section 1363(d) as a consequence of a change in the structure of petitioner and its subsidiaries. For the reasons set forth below, we hold that it is.

All section references are to the Internal Revenue Code as in effect for 1993. All dollar amounts are rounded.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Background

At the time the petition in this case was filed, Coggin Automotive Corp., formerly known as Coggin-O'Steen Investment Corp., was a Florida corporation with its principal place of business in Jacksonville, Florida. (Herein, both Coggin Automotive Corp. and Coggin-O'Steen Investment Corp. are referred to as petitioner.)

Petitioner was a holding company.  Before June 21, 1993, petitioner held over 80 percent of the stock of five C corporations, namely, Coggin Pontiac, Inc., Coggin Nissan, Inc., Coggin-O'Steen Imports, Inc., Coggin-O'Steen Motors, Inc., and Coggin Imports, Inc. (collectively, the subsidiaries), all of which were engaged in the retail sales of automobiles and light trucks. Each subsidiary was incorporated in Florida.

Six automobile dealerships were operated through the subsidiaries (five through direct ownership and one through ownership of a 50-percent general partnership interest).  Four of the dealerships (Coggin Pontiac-GMC, Coggin Honda, Coggin Nissan, and Coggin Acura) were located in Jacksonville, Florida; one (Coggin Motor Mall) was located in Fort Pierce, Florida; and one (Coggin-Andrews Honda) was located in Orlando, Florida.

From 1972 or 1973 until and including the fiscal year ended June 26, 1993, petitioner (as the common parent) filed consolidated Forms 1120, U.S. Corporation Income Tax Return, with its subsidiaries (hereinafter, the affiliated group).[1]  The subsidiaries maintained their inventories of automobiles and light trucks under the dollar-value LIFO method of accounting.

---

[1]  Petitioner and its subsidiaries reported their consolidated income on a 52- to 53-week basis; the fiscal year of the affiliated group ended in June.

Petitioner did not directly own any inventory. As of June 26, 1993, the accumulated LIFO reserves of the affiliated group were $5,077,808 (pre-S-election LIFO reserves).

From January 29, 1970 (the date of incorporation), until June 27, 1993, petitioner was a C corporation. As of June 27, 1993, the equity and voting interests in petitioner were held as follows:

| Shareholder | Ownership Interest | Voting Interest |
|---|---|---|
| Luther Coggin | 55.0% | 78% |
| Harold O'Steen | 22.5 | 11 |
| Howard O'Steen | 22.5 | 11 |

Luther Coggin was petitioner's president and chief executive officer; Harold and Howard O'Steen (collectively, the O'Steens) were vice presidents of petitioner. Mr. Coggin and the O'Steens were also the three directors of petitioner. The O'Steens did not assume an active managerial role in petitioner's operations.

On January 2, 1996, the O'Steens sold their stock interests in petitioner for $30,025,000 pursuant to a redemption and purchase agreement.

Coggin Pontiac-GMC

Coggin Pontiac-GMC began its operations in 1968; initially, its operations were conducted through Coggin Pontiac, Inc. Before June 21, 1993, Coggin Pontiac, Inc., owned the assets of its dealership, including the franchise rights.

Coggin Honda

Coggin Honda began its operations in 1982; initially, its operations were conducted through Coggin Pontiac, Inc. Before June 21, 1993, Coggin Pontiac, Inc., owned the assets of its dealership, including the franchise rights.

Coggin Nissan

Petitioner acquired Coggin Nissan in 1976; initially, its operations were conducted through Coggin Nissan, Inc. From its inception until July 8, 1987, Coggin Nissan, Inc., owned the assets of its dealership, including the franchise rights.

On or about July 9, 1987, Michael Andrews, the then-acting general manager of the dealership, acquired a 5-percent stock interest in Coggin Nissan, Inc., for $99,442. Between 1990 and 1997, Todd Seth was the general manager of Coggin Nissan. On or about April 1, 1992, Mr. Seth acquired a 5-percent stock interest in Coggin Nissan, Inc., for $118,581. The prices paid by Messrs. Andrews and Seth for their respective interests were determined by reference to the corporation's book value (with little or no value being assigned to the franchise rights), as reflected on the General Motors Operating Report (GMOR).[2]

---

[2] The General Motors Operating Report is a report customarily used by General Motors and other automotive dealers that provides a uniform method of determining certain financial information for a dealership, including book value for the dealership.

## Coggin Acura

Coggin Acura began its operations in 1986; initially, its operations were conducted through Coggin Imports, Inc. At all relevant times, Jack Hanania was the general manager of the dealership. From its inception until April 30, 1991, Coggin Imports, Inc. (a subsidiary of petitioner), owned the assets of the dealership, including the franchise rights.

On or about May 1, 1991, Mr. Hanania acquired a 20-percent interest in Coggin Imports, Inc., for $35,000. The price paid by Mr. Hanania for his interest was determined by reference to the corporation's book value (with little or no value being assigned to the franchise rights), as reflected on the GMOR.

## Coggin Motor Mall

Petitioner acquired Coggin Motor Mall in 1982; initially its operations were conducted through Coggin-O'Steen Motors, Inc. Since 1990, the general manager of the dealership has been Robert Caracello. Mr. Andrews was the director of operations for the dealership from 1993 through 1997. Since 1982, Coggin-O'Steen Motors, Inc., has owned the assets of the dealership, including the franchise rights.

On or about April 1, 1988, Mr. Caracello acquired 750 shares of stock in Coggin-O'Steen Motors, Inc.; he subsequently sold 250

of these shares to petitioner for $132,915. Immediately after this sale, Mr. Caracello held a 5-percent interest in Coggin-O'Steen Motors, Inc.

Coggin-Andrews Honda

Coggin-Andrews Honda (f.k.a. Coggin-O'Steen Honda) began its operations around December 1984. From 1985 until 1990, Coggin-O'Steen Imports, Inc. (Imports), owned Coggin-Andrews Honda. Petitioner owned an 80-percent interest in Imports; the remaining 20 percent was owned by Mr. Andrews.

In 1989, petitioner agreed to sell the Honda dealership to a group of investors. Because of a lack of financing, the deal collapsed.

Mr. Andrews wanted to be the sole owner of the Honda dealership. He was upset upon learning that petitioner had agreed to sell the dealership without his consent. Thereafter, he intensified his efforts to increase his percentage of ownership in Imports and eventually be the sole owner of the Honda dealership.

In 1990, Mr. Andrews began negotiations with Mr. Coggin regarding the acquisition of all the stock of Imports. Ultimately, it was agreed that Mr. Coggin would immediately sell Mr. Andrews an additional 30-percent interest in Imports and give him the option to purchase the entire Honda dealership (including the franchise rights) after 10 years.

In order to facilitate Mr. Andrews' eventual sole ownership of the dealership, as well as to provide Mr. Andrews immediately with some degree of control over the dealership's assets, Mr. Andrews' attorney, Charles Egerton recommended that the dealership's assets be held by a limited partnership. Mr. Egerton advised Mr. Andrews that operating the dealership through a limited partnership would afford Mr. Andrews the following advantages: (1) Limited liability protection; (2) the ability to make disproportionate distributions; (3) a single level of taxation; (4) a lower Federal tax rate; (5) the ability to avoid Florida's State income tax on his distributive share of profits; and (6) the ability to exercise greater control over the potential sale or liquidation of partnership assets. Mr. Coggin agreed to have the dealership's assets held by a limited partnership.

Coggin-Andrews Partnership

On December 14, 1990, Imports entered into an agreement with Andrews Automotive Corp. (Andrews Automotive), an S corporation solely owned by Mr. Andrews, to form the Coggin-Andrews partnership. The partnership was created through a series of related transactions. First, Mr. Andrews redeemed all of his stock in Imports, receiving in exchange a promissory note in the amount of $573,207 (the note). (Immediately prior thereto, and in contemplation of the redemption, Imports made a $1,750,000 distribution to petitioner.) Then, Mr. Andrews contributed both

the note and $107,000 in cash to Andrews Automotive. Finally, Andrews Automotive contributed the note and the $107,000, while Imports contributed the assets of Coggin Andrews Honda (valued at approximately $680,000), to the partnership, each receiving in exchange a 50-percent interest in the partnership.

Under the terms of the Coggin-Andrews partnership agreement (the partnership agreement), Imports was designated the partnership's managing partner.

The 1993 Restructuring Transactions

Petitioner's board of directors determined that because (1) the general managers wanted to own a direct interest in, and participate in, the profits of a stand-alone partnership dealership, and (2) Mr. Coggin wanted (as part of a succession plan and to provide liquidity to cover estate taxes) an effective way in which the general managers could buy him out, it would be advantageous to change the structure of petitioner from a C corporation to an S corporation and to operate the dealerships through partnerships similar to the Coggin-Andrews partnership. Consequently, during the latter part of May 1993, the board adopted a plan to change petitioner's structure and that of the subsidiaries pursuant to a series of transactions (the 1993 restructuring), as outlined in a "talking points paper" prepared by KPMG Peat Marwick (KPMG).

Permission from the automobile manufacturers associated with the particular dealerships had to be obtained before there could be a change in the ownership structure of the dealerships. Consequently, on or around May 27, 1993, petitioner sent letters to each of the automobile manufacturers notifying them of the proposed changes and requested their approval. Each letter stated, in part:

> After serious consideration of the present and future tax laws, the shareholders * * * are in the process of forming a Florida limited partnership * * *
>
> * * * * * * *
>
> It is our objective to complete the transfer of * * * [the dealership] operation to * * * [the newly formed partnership] on or before June 21, 1993. Completion of the transfer by that date is critical to us for tax reasons.

Each automobile manufacturer approved the ownership change.

The first step of the 1993 restructuring was the establishment of six new corporations. On May 27, 1993, articles of incorporation were filed for CP-GMC Motor Corp., CH Motor Corp., CN Motor Corp., CA Motor Corp., CO Motor Corp., and CFP Motor Corp. (collectively, the newly formed S corporations), and each corporation elected S corporation status, effective May 27, 1993. The corporations were incorporated for the purpose of being general partners in limited partnerships that would operate the dealerships. Mr. Coggin and the O'Steens were the sole

shareholders of the newly formed S corporations during all relevant periods, each holding the same proportion of ownership interests in the newly formed S corporations as they held in petitioner.

The second step of the 1993 restructuring was to create Florida limited partnerships. Contemporaneously with the establishment of the S corporations, petitioner's subsidiaries, the S corporations, and several of the dealerships' general managers entered into limited partnership arrangements (collectively, the limited partnerships), as follows:

| Name of Partnership | General Partner | Limited Partner |
| --- | --- | --- |
| CP-GMC Motors, Ltd. | CP-GMC Motor Corp. | Coggin Pontiac, Inc. |
| CH Motors, Ltd. | CH Motor Corp. | Coggin Pontiac, Inc. |
| CN Motors, Ltd. | CN Motor Corp. | Coggin Nissan, Inc. |
| CA Motors, Ltd. | CA Motor Corp. | Coggin Imports, Inc. |
| CFP Motors, Ltd. | CFP Motor Corp. | Coggin-O'Steen Motors, Inc. |
| CO Motors, Ltd. | CO Motor Corp. | Coggin-O'Steen Motors, Inc. |

Each general partner held a 1-percent interest in the limited partnership; each limited partner held a 99-percent interest.

The third step of the 1993 restructuring involved the redemption of Messrs. Andrews', Seth's, Hanania's, and Caracello's stock interests. On or about May 31, 1993, Coggin Nissan, Inc., redeemed Messrs. Andrews' and Seth's stock interests for $143,575 each. This amount was paid in the form of promissory notes made by Coggin Nissan, Inc. Petitioner paid a portion of the taxes attributable to the gain generated by the redemption. On the same day, Coggin Imports, Inc., redeemed Mr. Hanania's stock interest for $53,849, and Coggin-O'Steen Motors, Inc., redeemed Mr.

Caracello's stock interest for $222,133. Payment for these stock interests was in the form of a promissory note of the respective redeeming corporation. All redemptions were based on the book values of the dealerships as reflected on the GMOR.

Next, on June 21, 1993, each of the newly formed S corporations contributed $9,000 in cash to the limited partnership in which it was to hold an interest. Simultaneously, (1) Coggin Pontiac, Inc., contributed the assets and liabilities of its Pontiac dealership (valued at $5,737,129) to CP-GMC Motors, Ltd., (2) Coggin Pontiac, Inc., contributed the assets and liabilities of its Honda dealership (valued at $3,613,421) to CH Motors, Ltd., (3) Coggin Nissan, Inc., contributed the assets and liabilities of its Nissan dealership (valued at $1,600,467) to CN Motors, Ltd., (4) Coggin Imports, Inc., contributed the assets and liabilities of its Acura dealership (valued at $85,989) to CA Motors, Ltd., (5) Coggin-O'Steen Motors, Inc., contributed the assets and liabilities of its Mercedes Benz/BMW dealership (valued at $3,753,962) to CFP Motors, Ltd., and (6) Coggin-O'Steen Imports, Inc., contributed its general partnership interest in the Coggin-Andrews partnership (valued at $669,504) to CO Motors, Ltd.

Concurrently, (1) Messrs. Andrews and Seth each contributed the $143,575 Coggin Nissan, Inc. note to CN Motors, Ltd., in exchange for a 5-percent (total 10 percent) limited partnership interest, (2) Mr. Hanania contributed the $53,849 Coggin Imports,

Inc. note to CA Motors, Ltd., in exchange for a 20-percent limited partnership interest, and (3) Mr. Caracello contributed the $222,133 Coggin-O'Steen Motors, Inc. note to CFP Motors, Ltd., in exchange for a 5-percent limited partnership interest. By September 30, 1993, the aforementioned notes were canceled.

Each partnership agreement provided that the general partner, i.e., one of the newly formed S corporations, would have control over the operations of the partnership. Further, each partnership agreement provided that the general manager/limited partner had to tender his partnership interest to the partnership in the event he left.

Immediately following the transfers of assets to the partnerships, the subsidiaries were liquidated. As a result, petitioner obtained the subsidiaries' limited partnership interests.

On or about August 27, 1993, petitioner elected S corporation status, effective June 27, 1993. At the time of the election, no changes were made to petitioner's capital structure or to the ownership interests in its stock.

Subsequent Transactions

On November 1, 1993, Mr. Hanania acquired an additional 20-percent limited partnership interest in CA Motors, Ltd., for $179,707. Subsequently, he purchased another 10-percent limited partnership interest for $101,103. Ultimately, on July 1, 1996,

petitioner and Mr. Hanania entered into an agreement whereby Mr. Hanania was given the right to acquire the Acura dealership over 7 years. As part of the agreement, Mr. Hanania had the option to obtain the franchise rights of the dealership for an additional $700,000.

In 1998, petitioner sold its 50-percent interest in the partnership to Mr. Hanania for $2,397,500. Mr. Hanania borrowed the entire purchase price from petitioner, securing his loan with his shares of stock in his solely owned corporation.

On October 1, 1994, Mr. Seth purchased Mr. Andrews' 5-percent limited partnership interest in CN Motors, Ltd., for $201,138.

On January 1, 1996, CN Motor Corp., CO Motor Corp., CH Motor Corp., CA Motor Corp., and CFP Motor Corp. merged into CP-GMC Motor Corp. Simultaneously therewith, CP-GMC Motor Corp. changed its name to CF Motor Corp. As of that date, Mr. Coggin was the majority shareholder (75 percent) of CF Motor Corp. Most of the other 16 shareholders were key employees of petitioner; none of these employees had an ownership interest greater than 4.5 percent.

In 1997, petitioner agreed to sell the stock of CF Motor Corp., as well as the assets of the dealerships, to Asbury Automotive of Jacksonville, L.P. (Asbury). As part of the acquisition, petitioner agreed to sell to Asbury its 50-percent interest in the Coggin-Andrews partnership. Mr. Andrews objected

to selling the dealership and filed a lawsuit seeking to block the proposed sale. Settlement negotiations followed, and ultimately, Mr. Andrews agreed to sell his 50-percent interest in the Coggin-Andrews partnership to petitioner and Asbury for approximately $7.3 million.

Notices of Deficiency

In two notices of deficiency[3] (one regarding tax year ended June 26, 1993, and the other regarding tax years ended December 31, 1993, 1994, and 1995), respondent determined that pursuant to section 1363(d), petitioner's conversion to an S corporation triggered the inclusion of the affiliated group's pre-S election LIFO reserves ($5,077,808) into petitioner's gross income. Respondent's primary position was that the 1993 restructuring should be disregarded because it had no tax-independent purpose. Alternatively, respondent maintained that under the aggregate approach of partnerships a pro rata share ($4,792,372) of the pre-S election LIFO reserves was attributable to petitioner. Respondent

---

[3] Before the issuance of the notices of deficiency, respondent's National Office issued a technical advice memorandum, Tech. Adv. Mem. 97-16-003 (Sept. 30, 1996), which concluded that petitioner would be subject to LIFO recapture pursuant to sec. 1363(d) as a consequence of a change in its and its subsidiaries' structure.

Technical advice memorandums are not binding on us. We mention the issuance of the technical advice memorandum solely for the sake of completeness.

concluded that under either theory, there was an increase in petitioner's tax liability, payable in four equal annual installments.[4]

OPINION

Use of LIFO, vis-a-vis FIFO, often allows a taxpayer the benefit of income deferral, particularly in periods of rising inventory costs and stable or growing inventory stock.  The amount of cumulative income deferral obtained through the use of the LIFO method of accounting is represented in a taxpayer's LIFO reserve.

Section 1363(d) mandates recapture of the LIFO reserve upon the conversion of a C corporation to an S corporation. In relevant part, section 1363(d) provides:

> SEC. 1363(d).  Recapture of LIFO Benefits.--
>
> (1) In general.--If--
>
>> (A)  an S corporation was a C corporation for the last taxable year before the first taxable year for which the election under section 1362(a) was effective, and
>>
>> (B)  the corporation inventoried goods under the LIFO method for such last taxable year,
>
> the LIFO recapture amount shall be included in the gross income of the corporation for such last taxable year (and appropriate adjustments to the basis of the inventory shall be made to take into account the amount included in gross income under this paragraph).

---

[4]     Pursuant to respondent's alternative position, the tax deficiency for the 4 taxable years under consideration is $408,300.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) LIFO recapture amount.--For purposes of this subsection, the term "LIFO recapture amount" means the amount (if any) by which--

(A) the inventory amount of the inventory asset under the first-in, first-out method authorized by section 471, exceeds

(B) the inventory amount of such assets under the LIFO method.

Any increase in tax resulting from the application of section 1363(d) is required to be paid in four equal installments beginning in the last taxable year for which the corporation was a C corporation. See sec. 1363(d)(2).

In enacting section 1363(d), Congress was concerned that a corporation maintaining its inventory under LIFO might circumvent the built-in gain rules of section 1374 to the extent the corporation did not liquidate its LIFO layers during the 10 years following its conversion from a C corporation to an S corporation.[5]

---

[5] H. Rept. 100-391 (Vol. II), at 1098 (1987), in relevant part, states:

> The committee is concerned that taxpayers using the LIFO method may avoid the built-in gain rules of section 1374. It believes that LIFO method taxpayers, which have enjoyed the deferral benefits of the LIFO method during their status as a C corporation, should not be treated more favorably than their FIFO (first-in, first-out) counterparts. To eliminate this potential disparity in treatment, the committee believes it is appropriate to require a LIFO taxpayer to recapture the benefits of using the LIFO method in the year of conversion to S status.

Respondent, relying on <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 583-584 (1978), takes the position that the 1993 restructuring "was not imbued with tax-independent considerations, but was instead shaped solely by tax-avoidance features that have meaningless labels attached."  In this regard, respondent posits: "The 1993 restructuring was conceived and executed for the principal purpose of permanently escaping corporate level taxes on the LIFO reserves built into the LIFO inventories of petitioner's former consolidated subsidiaries."

Petitioner disputes respondent's assertion, maintaining that the 1993 restructuring occurred in order to achieve tax-independent economic and/or business desires of both Mr. Coggin and the general managers.  We agree with petitioner.  The record reveals:  (1) General managers were vital to the successful operation of the automobile dealerships; (2) providing incentives to attract and retain quality general managers was essential in the success of the automobile dealerships; (3) operating the automobile dealerships in stand-alone partnership form afforded the general managers flexibility greater than that offered by operating the dealerships in corporate form; and (4) Mr. Coggin and the general managers never discussed recapture of the LIFO reserves.

It is axiomatic that (1) tax considerations may play a legitimate role in shaping a business transaction, and (2) tax planning does not necessarily transform an event otherwise

nontaxable into one that is taxable. Here, Mr. Coggin sought the advice of tax professionals--both accountants and tax attorneys. The legal opinion rendered by the law firm that Mr. Coggin engaged did not address LIFO recapture. The talking points paper prepared by KPMG set forth the potential risk of LIFO recapture, as well as a calculation of the potential tax liability, if section 1363(d) applied. Specifically, the document stated:

> LIFO inventory should not be recaptured on conversion of COIC [Coggin-O'Steen Investment Corp.] from a C corporation to an S corporation <u>since COIC does not inventory any goods under the LIFO method for its last tax year as a C corporation (I.R.C. section 1363(d))</u> (some degree of IRS risk which is being reviewed by our Washington National Tax practice).

But notably, the paper did not address the tax benefits of avoiding the LIFO recapture.

To conclude this aspect of our opinion, we find that the 1993 restructuring was: (1) A genuine multiple-party transaction with economic substance; (2) compelled by business realties, imbued with tax-independent considerations; and (3) not shaped solely by tax avoidance features. Cf. <u>Frank Lyon Co. v. United States</u>, <u>supra</u>. Consequently, we reject respondent's primary position that there was no tax-independent business purpose for the 1993 restructuring. We now turn our attention to respondent's alternative position.

For tax purposes, a partnership may be viewed either (1) as an aggregation of its partners, each of whom directly owns an interest in the partnership's assets and operations, or (2) as a separate

entity, in which separate interests are owned by each of the partners. Subchapter K of the Internal Revenue Code (Partners and Partnerships) blends both approaches. In certain areas, the aggregate approach predominates. See sec. 701 (Partners, Not Partnership, Subject to Tax), sec. 702 (Income and Credits of Partner). In other areas, the entity approach predominates. See sec. 742 (Basis of Transferee Partner's Interest), sec. 743 (Optional Adjustment to Basis of Partnership Property). Outside of subchapter K, whether the aggregate or the entity approach is to be applied depends upon which approach more appropriately serves the Code provision at issue. See Holiday Village Shopping Ctr. v. United States, 773 F.2d 276, 279 (Fed. Cir. 1985); Casel v. Commissioner, 79 T.C. 424, 433 (1982); Conf. Rept. 2543, 83d Cong., 2d Sess. 59 (1954).

Respondent argues that the legislative intent underlying the enactment of section 1363(d) requires the application of the aggregate theory. Respondent asserts that Congress enacted section 1363(d) in order to ensure that the corporate level of taxation be preserved on built-in gain assets (such as LIFO reserves) that fall outside the ambit of section 1374. In this regard, respondent contends that failure to apply the aggregate theory to section 1363(d) would allow the gain deferred under the LIFO method to completely escape the corporate level of taxation upon a C corporation's election of S corporation status and would eviscerate

Congress' supersession of <u>General Utils. & Operating Co. v. Helvering</u>, 296 U.S. 200 (1935).

Petitioner maintains that although there are no cases that apply the aggregate or entity approach to inventory items, the focus with respect to accounting for inventory is done at the partnership level. In essence, petitioner asserts that the LIFO recapture amount under section 1363(d) is a component of a partnership's taxable income that must be computed at the partnership level. Petitioner posits that it would be incongruent to treat the calculation of the LIFO recapture amount as an item of income under the entity approach while applying the aggregate approach to attribute the ownership of inventory to the partners. Moreover, petitioner argues that section 1363(d)(4)(D) operates to prevent the inventory of one member of an affiliated group from being attributed to another member.

To summarize the parties' positions: respondent maintains that for purposes of section 1363(d), each of the limited partnerships (i.e., CP-GMC Motors, Ltd., CH Motors, Ltd., CN Motors, Ltd., CA Motors, Ltd., CFP Motors, Ltd., and CO Motors, Ltd.) should be viewed as an aggregation of its partners, and consequently, petitioner, as a limited partner in each of the partnerships, is deemed to own a pro rata share of each partnership's inventory of automobiles and light trucks. Conversely, petitioner maintains that each of the limited

partnerships should be viewed as a separate entity, and consequently, none of any limited partnership's inventory or LIFO reserve is deemed to be owned by petitioner or the other partners. We agree with respondent's position for the following reasons.

In 1986, Congress enacted the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, secs. 631-633, 100 Stat. 2085, 2269-2282, which did away with the General Utilities doctrine. (Under the General Utilities doctrine, corporations generally had not been taxed on the distribution of assets whose fair market values exceeded their tax bases. See Estate of Davis v. Commissioner, 110 T.C. 530, 548 n.13 (1998).) In TRA section 632(a), section 1374 (Tax Imposed on Certain Built-In Gains) was amended to prevent the potential circumvention of the corporate level of tax on the distribution of appreciated (built-in gain) assets by a former C corporation that held such assets at the time of its conversion to an S corporation.[6] See Rondy, Inc. v. Commissioner, T.C. Memo. 1995-372 ("the original purpose of section 1374 was to support Congress' repeal of the General Utilities doctrine"); H. Conf. Rept. 99-841 (Vol. II), at II-198 to II-199, II-203 (1986), 1986-3 C.B. (Vol. 4), 1, 198-199, 203.

It became apparent that the goal of section 1374 was not being achieved with respect to former C corporations that used the LIFO

---

[6] In general, sec. 1374 requires an S corporation to pay a corporate-level tax on any net recognized built-in gains recognized within 10 years following the effective date of the S election.

method of accounting because a taxpayer that experienced rising acquisition costs would seldom, if ever, experience a decrement of its LIFO reserves.[7]   Congress thus recognized that the deferred built-in gain resulting from using the LIFO method might escape taxation at the corporate level.  In light of this potential for abuse, section 1363(d) was enacted.  See H. Rept. 100-391 (Vol. II), at 1098 (1987).

After considering the legislative histories of sections 1374 and  1363(d), we conclude that the application of the aggregate approach (as opposed to the entity approach) of partnerships in this case better serves Congress' intent.  By enacting sections 1374  and  1363(d),  Congress  evinced  an  intent  to  prevent corporations from avoiding a second level of taxation on built-in gain assets by converting to S corporations.  Application of the aggregate approach to section 1363(d) is consistent with Congress' rationale  for  enacting  this  section  and  operates  to  prevent  a corporate  taxpayer  from  using  the  LIFO  method  of  accounting  to permanently  avoid  gain  recognition  on  appreciated  assets.   In contrast, applying the entity approach to section 1363(d) would potentially allow a corporate partner to permanently avoid paying a  second  level  of  tax  on  appreciated  property  by  encouraging

_____

        [7]     See, e.g., Staff of Joint Committee on Taxation, Description of Possible Options to Increase Revenues 189 (J. Comm. Print 1987) ("[section 1374] may be ineffective in the case of a LIFO inventory, since a taxpayer experiencing constant growth may never be required to invade LIFO inventory layers").

transfers of inventory between related entities.[8]  This result clearly would be inconsistent with the legislative history of sections 1363(d) and 1374 and the supersession of the General Utilities doctrine.

Courts have, in some instances, used the aggregate approach for purposes of applying nonsubchapter K provisions.  For instance, in Casel v. Commissioner, 79 T.C. at 433, we upheld the Commissioner's use of the aggregate approach for purposes of applying section 267 (disallowance of losses between related parties).  In Holiday Village Shopping Ctr. v. United States, 773 F.2d at 279, the Court of Appeals for the Federal Circuit applied the aggregate approach for purposes of determining the extent of depreciation recapture to each shareholder.  Similarly, the Court of Appeals in Unger v. Commissioner, 936 F.2d 1316 (D.C. Cir. 1991), affg. T.C. Memo. 1990-15, used the aggregate approach in determining a taxpayer's permanent establishment.  In each of these instances, the court analyzed the relevant legislative history and statutory scheme in determining whether the aggregate or entity approach was more appropriate.  Moreover, we are mindful that the aggregate approach is generally applied to various subchapter K provisions dealing with inventory and other built-in gain assets

---

[8]    Under sec. 704(c) the contributing partner is normally allocated the "built-in" gain of the asset.  However, if there is no liquidation of LIFO layers, no gain or loss would be allocated to a contributing partner who uses the LIFO method.  This would render sec. 704(c) effectively useless in allocating the built-in gain deferred by the LIFO method of accounting.

(i.e., receivables).  See, e.g., secs. 704(c), 731, 734(b), 743(b), 751.

We recognize that in several instances courts have found the entity approach better than the aggregate approach.  For example, in <u>P.D.B. Sports, Ltd. v. Commissioner</u>, 109 T.C. 423 (1997), this Court used the entity approach for purposes of applying section 1056.  Similarly, in <u>Madison Gas & Elec. Co. v. Commissioner</u>, 72 T.C. 521, 564 (1979), affd. 633 F.2d 512 (7th Cir. 1980), this Court and the Court of Appeals for the Seventh Circuit applied the entity approach in determining whether expenses were ordinary and necessary under section 162.  Likewise, in <u>Brown Group, Inc. & Subs. v. Commissioner</u>, 77 F.3d 217 (8th Cir. 1996), revg. 104 T.C. 105 (1995), the Court of Appeals for the Eighth Circuit concluded that the entity approach, rather than the aggregate approach, should be used in characterizing income (subpart F income) earned by the partnership.  We do not believe the holdings in those cases to be dispositive here.  The outcomes in those cases were based upon the specific legislative histories and statutory schemes of the respective Code provisions at issue.  Each court viewed the respective statute in the context in which it was enacted and concluded that the entity approach was more appropriate than the aggregate approach to carry out Congress' intent.  Here, as stated, both the legislative history and the statutory scheme of section 1363(d) mandate the application of the aggregate approach.

Finally, we do not believe that section 1363(d)(4)(D) operates

to prevent the attribution of the dealership's LIFO reserves to petitioner.  Section 1363(d)(4)(D) provides:

> (D) Not treated as member of affiliated group.-- Except as provided in regulations, the corporation referred to in * * * [section 1363(d)(1)] shall not be treated as a member of an affiliated group with respect to the amount included in gross income * * *

Simply stated, section 1363(d)(4)(D) requires that a member of an affiliated group that elects to be an S corporation be treated as an independent entity for purposes of determining the amount included in gross income.  Section 1363(d)(4)(D) requires only a converting member of the affiliated group (rather than each member of the affiliated group) to be responsible for the tax imposed on the recapture of the corporation's LIFO reserves.  See S. Rept. 100-445, at 438 (1988).  Section 1363(d)(4)(D) does not prohibit attribution of the inventory and LIFO reserves to petitioner in this case.

To conclude, we hold that the aggregate approach (as opposed to the entity approach) better serves the underlying purpose and scope of section 1363(d) in the circumstances of this case. Consequently, petitioner is deemed to own a pro rata share ($4,792,372) of the dealerships' inventories. Accordingly, we hold that upon its election of S corporation status, petitioner was required to include in its gross income its ratable share of the LIFO recapture amount.

In reaching our conclusions, we have considered carefully all arguments made by the parties for a result contrary to that

expressed herein, and to the extent not discussed above, we find them to be without merit.

The deficiencies set forth in the notices of deficiency are based on petitioner's failure to recapture its LIFO reserves of $5,077,808 into its income. Based on our holding that $4,792,372, rather than $5,077,808, of the dealerships' pre-S election LIFO reserves must be included in petitioner's income, the tax deficiency is $408,300 (rather than $432,619), pursuant to respondent's alternative position, for each of the years under consideration. Accordingly,

Decision will be entered for respondent in the reduced amounts for the years under consideration.