T.C. Memo. 2000-352


UNITED STATES TAX COURT


SALINA PARTNERSHIP LP, FPL GROUP, INC., A PARTNER
OTHER THAN THE TAX MATTERS PARTNER, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25084-96.          Filed November 14, 2000.


     In 1991, FPL incurred a substantial capital loss on
the sale of a subsidiary.  In December 1992, GS, an
investment bank, persuaded FPL to invest in a domestic
limited partnership, S, newly formed at GS's request by
two affiliates of ABN, an international bank based in The
Netherlands.  S, at GS's suggestion, took a substantial
short position in U.S. Treasury bills.  FPL purchased a
98-percent limited partnership interest in S to take
advantage of desired tax benefits and to enhance its
return on its short-term, fixed-income investments.
Immediately following FPL's investment, S closed its
short position in U.S. Treasury bills.

     Relying on a series of complex partnership basis
adjustment provisions, S concluded that it realized a
$344 million short-term capital gain, of which $337
million was allocated to FPL.  FPL thereupon claimed a
capital loss carryover from 1991 to offset nearly all of
its distributive share of S's capital gain.

During 1993 and most of 1994, S pursued a sophisticated investment strategy. S was liquidated in 1994. FPL, which had increased its outside basis in its interest in S by the $337 million gain it had reported in 1992, claimed large ordinary losses attributable to its interest in S for the taxable years 1994 through 1997.

R issued a notice of final partnership administrative adjustment to S determining that S did not realize a $344 million short-term capital gain for the period ended Dec. 31, 1992, on the alternative grounds that: (1) FPL's initial investment in S was a sham in substance; and/or (2) S failed to properly compute its substituted basis (from its partners) pursuant to sec. 752, I.R.C. FPL filed a timely petition for readjustment in its capacity as a notice partner of S.

Held: FPL's investment in S was not a sham in substance inasmuch as FPL invested in S in order to achieve legitimate business objectives independent of purported tax benefits and FPL's investment produced objective economic consequences. Held, further, R's adjustments are sustained on the ground that S's short position in Treasury bills generated a partnership "liability", within the meaning of sec. 752, I.R.C., which liability S failed to account for in computing its substituted basis (from its partners) in its assets.

Robert T. Carney and Paul S. Manning, for petitioner.

Sergio Garcia-Pages, John T. Lortie, and Gary F. Walker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: Respondent issued a notice of final partnership administrative adjustment (FPAA) to Caraville Corporation, N.V., the tax matters partner (TMP) of Salina Partnership, LP (hereinafter, Salina or the partnership), setting

forth adjustments to the partnership's tax return for its taxable year ended December 31, 1992. Respondent subsequently mailed a copy of the FPAA to FPL Group, Inc. (FPL or petitioner), a Salina notice partner. FPL, in its capacity as a partner other than the TMP, filed a timely petition for readjustment contesting the FPAA.[1] See sec. 6226(b).

The issue for decision is whether the partnership realized a short-term capital gain of $344,234,365 for the taxable year ended December 31, 1992.[2] (The situation presented in this case is one in which "normal" roles of the parties appear to be reversed inasmuch as FPL is defending Salina's reporting of the $344 million gain against respondent's assertion that Salina realized a short-term capital gain of only $334,214.) Respondent's determination is based on alternative grounds, including arguments that: (1) FPL's purchase of a 98-percent partnership interest in Salina was a sham in substance; and (2) Salina erred in failing to apply section 752 in computing its substituted basis (from its partners) in its assets.

---

[1] The parties stipulated that venue for purposes of appeal is to the U.S. Court of Appeals for the Eleventh Circuit. See sec. 7482(b)(2).

[2] The parties agree that if petitioner prevails, the amount of the partnership's interest income is $700,713 for the period in question, whereas if respondent prevails, the amount of the partnership's interest income is $147,252.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for 1992, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits are incorporated herein by this reference.

I. FPL

FPL, the stock of which is publicly traded, is a holding company and the parent of various wholly owned subsidiaries including Florida Power and Light Co. (Florida Power), the largest electric public utility in the State of Florida, and FPL Capital Group (FPL Capital). FPL filed consolidated returns with its various subsidiaries during the period in question.

A. FPL Officers

Paul Evanson assumed the position of chief financial officer of FPL on December 7, 1992. Prior to joining FPL, Mr. Evanson's professional experience included 6 years as a tax specialist at Arthur Andersen, a large firm of certified public accountants, and 5 years as president and chief operating officer of Lynch Corp. Prior to his employment at Arthur Andersen, Mr. Evanson was awarded a juris doctor degree from Columbia University School of Law and an LL.M. in taxation degree from New York University.

James Higgins, FPL's vice president for taxes, was responsible for all income tax planning, research, and compliance. Dilek Samil, FPL's corporate treasurer, was responsible for financial forecasting and analysis. In addition, Ms. Samil was responsible for managing FPL's long-term and short-term funding needs. FPL's long-term funding needs normally were satisfied by issuing debt and equity securities, while FPL's short-term funding needs were met through the company's normal cash-flow and the issuance of commercial paper. Jeffrey Holtzman, FPL's assistant treasurer, was primarily responsible for bank relations and assessing FPL's investments. Michael Wynn, an FPL financial analyst, was responsible for various cash management activities and special projects.

B. FPL's Restructuring Plan/Cash-flow

In early 1991, FPL decided to restructure its operations by selling noncore businesses and focusing on its utility businesses, particularly Florida Power. Between 1991 and 1999, FPL sold a number of its subsidiary businesses including Colonial Penn Group (CPG)--an insurance holding company, Telesat--a cable television operation, Alandco--a real estate subsidiary, Turner Foods--a citrus producer, and a separate banking business.

During 1992, FPL raised cash through a secondary stock offering. FPL also had excess cash-flow from normal operations.

FPL usually held its short-term investments in commercial paper with rates of return averaging 3.25 percent.

### C. FPL's 1991 Capital Loss (Sale of CPG)

On its consolidated income tax return for 1991, FPL reported a capital loss of $581,921,987 attributable to its sale of CPG. FPL carried back approximately $131 million of the CPG loss to taxable years prior to 1991. On its consolidated income tax return for 1992, FPL claimed a loss carryover of approximately $311 million attributable to its CPG loss.

Respondent issued a notice of deficiency to FPL for, among other years, 1991 and 1992. Respondent determined, in pertinent part, that FPL had understated the amount of its CPG loss subject to disallowance pursuant to section 1.1502-20, Income Tax Regs.[3] FPL filed a petition for redetermination with the Court (docket No. 5271-96) contesting respondent's determination regarding the correct amount of its CPG loss and challenging the validity of section 1.1502-20, Income Tax Regs.

## II. The Partnership Proposal

### A. Goldman Sachs & Co./STAMPS

FPL was a client of Goldman Sachs & Co. (Goldman Sachs), a large investment bank. Goldman Sachs had advised FPL with regard

---

[3]     Sec. 1.1502-20(a), Income Tax Regs., states the general rule that no deduction is allowed for any loss recognized by a member of the affiliated group with respect to the disposition of stock of a subsidiary.

to both the purchase of CPG in 1985 and the sale of the company in 1991. At all relevant times, David A. Ackert was a vice president at Goldman Sachs.

In 1992, Mr. Ackert developed an investment strategy called Special Treasury and Mortgage Partnership Units (STAMPS). The STAMPS strategy employed leveraged and hedged investments in short-term U.S. Treasury securities, mortgage-backed securities, and other arbitrage positions in fixed-income securities, in an effort to provide a cash investment vehicle for corporate or institutional clients seeking above-market returns.

The STAMPS strategy was designed not only as an investment strategy, but also involved accounting, tax, and legal considerations. Mr. Ackert concluded that it would be preferable for corporate investors to pursue the STAMPS investment strategy through a partnership that would allow the investor the possibility of "off balance sheet" accounting treatment. Mr. Ackert believed that off balance sheet accounting treatment was essential to making the STAMPS strategy appealing to potential investors because, to the extent that the program required a leveraged position, the investor's balance sheet would reflect the net amount of its investment without showing any related debt.

B. BEA Associates/MAPS

In conjunction with the creation of the STAMPS investment strategy, Mr. Ackert approached Mark Silverstein, vice president

and portfolio manager at BEA Associates (BEA), an investment advisory and cash management firm based in New York, to inquire whether BEA would be interested in serving as the investment adviser and portfolio manager for potential investors in the STAMPS strategy. Mr. Silverstein agreed to work with Mr. Ackert's clients on the understanding that BEA would be compensated for its services through management fees computed as a percentage of the assets under its direction.

BEA, recognized as a leading fixed-income portfolio manager, utilized an investment strategy with similarities to STAMPS known as mortgage arbitrage partners or MAPS. The MAPS strategy included leveraged and hedged investments in U.S. Treasury securities, asset-backed securities, mortgaged-backed securities, and international and corporate bonds. Though comparable in some respects with the STAMPS strategy, the MAPS strategy contemplated investments in a broader array of securities with maturities (approximately 3 to 6 months) of shorter duration.

### C. Mr. Ackert's Proposal to FPL

Mr. Ackert was aware that FPL had incurred a substantial capital loss on its sale of CPG in 1991. In early October 1992, Mr. Ackert met with FPL representatives in Florida and proposed that FPL purchase a 98-percent limited partnership interest in a preexisting domestic limited partnership controlled by an international bank for the purpose of investing in the STAMPS

strategy. Mr. Ackert promoted the STAMPS strategy as a means to increase the return on FPL's short-term, fixed-income investments. At the same time, Mr. Ackert informed FPL that it should rely upon its own independent accounting, legal, and tax advisers regarding the consequences of the STAMPS investment strategy. During a private meeting with Mr. Higgins, Mr. Ackert suggested that the partnership's investments could be arranged so that, upon entry into the partnership, FPL would recognize a capital gain for Federal income tax purposes and simultaneously create a built-in loss in its partnership interest.

In late October 1992, Mr. Ackert introduced Mr. Silverstein to FPL's representatives. Mr. Silverstein took the opportunity to explain the MAPS investment strategy and to offer BEA's investment services to FPL. In mid-November 1992, FPL representatives met with Mr. Silverstein at BEA's New York office. At FPL's request, Mr. Silverstein presented FPL with several analyses of the financial risks and rewards associated with the MAPS investment strategy under a variety of economic scenarios. Using Treasury bills (with a then 3 percent annual rate of return) as a benchmark, Mr. Silverstein projected that the MAPS strategy would allow FPL to earn between 4 and 7 percent over current Treasury bill yields. However, Mr. Silverstein cautioned that he could not guarantee a specific return inasmuch as FPL's investment would be subject to market risks. FPL's representatives concluded that the company

could earn a higher return under the MAPS strategy relative to historic returns that it had earned investing in short-term commercial paper.

FPL began preparations to enter into the proposed partnership in early December 1992. On December 9, 1992, Mr. Silverstein issued a memorandum to Mr. Wynn at FPL stating that he was in the process of arranging credit with certain securities dealers and requesting information from FPL regarding the partnership. On December 14, 1992, Margaret Watson, a vice president for Chemical Bank (Chemical), forwarded a memorandum to Mr. Wynn stating that Chemical had assigned an account number to a multi-currency master custody account for a partnership identified as New Coral Partnership. Upon receipt of the memorandum, Mr. Wynn struck the reference to New Coral Partnership, entered the name "Salina Partnership", and forwarded the memorandum to Mr. Silverstein at BEA.

D.  ABN AMRO Bank, N.V.

ABN AMRO Bank, N.V. (ABN) is a large bank based in The Netherlands with international operations. During 1992, Jaap Van Burg, an attorney, served as an assistant managing director at two ABN affiliates known as ABN AMRO Trust Co., N.V. (ABN Trust) and N.V. Fides.

In October 1992, concurrent with his discussions with FPL, Mr. Ackert informed Mr. Van Burg that he had a client that might be

interested in pursuing the STAMPS investment strategy and inquired whether ABN would be interested in forming a partnership for use in connection with that strategy. Mr. Ackert informed Mr. Van Burg that the partnership would be most marketable to his client if the partnership held a $350 million short position in Treasury bills. Mr. Van Burg obtained approval for ABN to participate in the transaction as outlined by Mr. Ackert.

III. Salina Partnership

On July 16, 1992, and October 22, 1992, ABN formed two limited liability companies, Caraville Corporation, N.V. (Caraville), and Pallico Corporation, N.V. (Pallico). Caraville and Pallico initially were each capitalized with $6,001. ABN controlled Caraville and Pallico through ABN Trust and N.V. Fides, as managing directors, respectively (both of which were in turn owned by ABN). As foreign entities, ABN, Caraville, and Pallico were not subject to U.S. income tax.

Caraville owned the stock of Aldershot Corp. On August 17, 1992, Aldershot Corp. paid a dividend of $1,928,669 to Caraville.

A. Formation of the Partnership

On December 16, 1992, Caraville and Pallico formed Salina as a limited partnership under the laws of the State of Delaware. The Salina partnership agreement stated in pertinent part that the partnership was organized to invest in "Permitted Investments", a term defined as obligations of the United States and obligations of

any agency that are backed by the full faith and credit of the United States with remaining terms to maturity of no more than 10 years, mortgaged-backed securities with a stated maturity of no more than 7 years, and certain repurchase and reverse repurchase contracts.

On December 17, 1992, Caraville contributed $750,000 in exchange for a 1-percent general partnership interest in Salina, while Pallico contributed $74,250,000 in exchange for a 99-percent limited partnership interest. The funds that Pallico contributed to Salina were transferred to Pallico through a revolving credit agreement between ABN and Escorial Corporation, N.V., an ABN affiliate managed by ABN Trust. Mr. Van Burg assumed that ABN also was the source of Caraville's contribution to Salina.

The partnership agreement stated that the partnership would pay a quarterly management fee of $125,000 to Caraville.

B.  Salina's Short Year December 17 Through 27, 1992

On December 17, 1992, Salina opened a custodial account with ABN's New York office. On December 17, 1992, Salina purchased, through ABN, U.S. Treasury notes with a face value of $140 million for a price of $139,891,953 (net of $320,192 accrued interest). The Treasury notes each bore an interest rate of 4.625 percent and were due to mature on November 30, 1994. Salina financed approximately one-half of the purchase price of the Treasury notes through a master repurchase agreement with Goldman Sachs (the

Salina/Goldman Sachs master repurchase agreement) under which Salina borrowed $70,087,500 from Goldman Sachs and collateralized the loan with a portion of the Treasury notes it had purchased.[4] Salina treated the Goldman Sachs loan as a liability on its opening balance sheet as of December 28, 1992.

On December 17, 1992 (consistent with Mr. Ackert's earlier request to Mr. Van Burg), Salina entered into a short sale of U.S. Treasury bills with a face value of $350 million for a price of $344,066,593.[5] The Treasury bills were due to mature on June 17,

---

[4] Repurchase agreements (repos) and reverse repurchase agreements (reverse repos) are frequently used by dealers in government securities, financial institutions, and others as methods for temporary cash management, interest rate arbitrage, or the borrowing of securities used in the course of a dealer's business. In a repo transaction, the first party (e.g., a dealer) sells securities (generally U.S. Treasury and Federal agency securities) to a second party (e.g., a customer) and simultaneously agrees to repurchase a like amount of the same securities at a stated price (generally greater than the original sales price) on a fixed, future date. Repo transactions, from the viewpoint of the seller (such as a dealer), provide financing to acquire newly issued government securities or other portfolio assets; from the viewpoint of the purchaser, a repo transaction provides a means by which funds can be invested for a desired period while holding as collateral a virtually risk-free asset in the event the seller breaches its agreement to repurchase. See Price v. Commissioner, 88 T.C. 860, 864 n.9 (1987)

[5] One commentator has described a short sale as follows:

More completely, a short sale may be defined as consisting of two transactions: (1) the taxpayer's sale of property (typically, securities) borrowed from another person (typically, a broker), and (2) the subsequent closing out of the short position by the taxpayer's delivery of securities to the person who loaned the securities that were sold.

(continued...)

1993.  Salina completed the short sale transaction described above to the extent of $175 million executed through Goldman Sachs and $175 million executed through ABN.  To complete delivery of the Treasury bills, Salina entered into a master repurchase agreement with ABN (the Salina/ABN master repurchase agreement) under which Salina lent $343,875,000 to ABN, and ABN collateralized the loan with the Treasury bills that Salina sold short.  Salina treated the amount it was due from ABN under the Salina/ABN master repurchase agreement ($343,875,000) and accrued interest thereon ($278,921) as assets on its opening balance sheet.  Salina treated the amount of

---

[5](...continued)
> In the absence of statutory guidance, the treatment of * * * [short sale] transactions would be unclear because the first transaction is in form a sale but gain or loss cannot be computed because the taxpayer's cost for the securities is unknown, whereas the second transaction is in form the repayment of a loan. [Fn. ref. omitted.]

2 Bittker & Lokken, Federal Taxation Of Income, Estates And Gifts, par. 54.3.1, at 54-21 (2d ed. 1990).

The strategy of a short sale is that by the time the security is covered, the seller will have acquired the security by purchasing it on the open market at a price lower than that for which it was sold, thereby making a profit.  Another way to cover a short position is to use the security obtained in a reverse repo transaction.  Reverse repo transactions are the mirror images of repo transactions--securities are purchased by the first party subject to the obligation of the second party to repurchase them.  Notwithstanding the first party's obligation to sell (in a reverse repo transaction) a like amount of the same securities back to the second party, the first party generally is entitled to use the securities in transactions with third parties.  See Price v. Commissioner, supra at 864-865 nn. 9, 11.

the Treasury bills that it sold short ($344,447,250) as a liability on its opening balance sheet.

For the period December 17 through 27, 1992, Salina earned $398,292 on its investments for an annualized return of 17.62 percent.

C.  FPL's Investment in Salina

On December 14, 1992, Mr. Evanson obtained authorization from FPL's board of directors to invest in the Salina partnership.  The minutes of the December 14, 1992, board of directors' meeting state in pertinent part:

> [The Chairman] reported that the officers of the Corporation were considering investing approximately $75 million of the funds raised from the sale of common stock in 1992 for future capital requirements in an investment partnership.  These funds were not needed immediately and were currently invested in short-term securities yielding a little more than 3% per annum.  Investing in the partnership would increase the return on the funds substantially and still keep them available for capital expenditures as needed.  In addition, the partnership could engage in certain transactions that could utilize certain of the tax losses from the sale of Colonial Penn. Mr. Evanson then explained the proposed investment activities of the partnership.

FPL conditioned its participation in the partnership upon Salina's agreements to: (1) Appoint Mr. Silverstein as its investment manager, and (2) liquidate its investments by December 30, 1992.  Salina agreed to FPL's conditions.  On December 28, 1992, Salina executed a "Financial Advisory Agreement" appointing

BEA to serve as its financial adviser "with respect to all securities and property with an initial value of $75,398,292.47" held by Chemical Bank.

On December 28, 1992, Caraville, Pallico, and FPL executed an amended partnership agreement that included an expanded list of permitted investments. The partnership agreed to pay quarterly management fees to Caraville (totaling $750,000) during 1993 and 1994. The partnership agreement states that the partnership would be obliged to redeem FPL's partnership interest or dissolve and liquidate at FPL's request.

On December 28, 1992, Goldman Sachs issued a letter to FPL stating that FPL did not rely upon Goldman Sachs for advice or information relating to the financial, legal, tax, accounting, or other matters in connection with FPL's investment in Salina.

On December 28, 1992, FPL transferred $76,540,327 to Pallico in exchange for a 98-percent limited partnership interest in Salina. FPL treated $73,890,327 of its $76,540,327 payment to Pallico as capital invested in the partnership. The $73,890,327 includes $390,327 representing Pallico's share of Salina's net partnership gain during the period December 17 to 27, 1992.

Pallico retained $50,000 of the $76,540,327 payment that it received from FPL. Pallico transferred $73,890,327 to ABN--the same amount that FPL treated as its capital contribution to Salina--in partial repayment of the loan that ABN provided to Pallico in

connection with the formation of Salina.  In addition, Pallico made the following payments on behalf of FPL:

| Payee | Amount | Purpose |
|-------|--------|---------|
| Andrews & Kurth, LLP | $350,000 | Legal fees |
| ABN AMRO Bank | 1,000,000 | Fees |
| Goldman Sachs | 1,250,000 | Brokerage fees |

Ms. Samil recalled negotiating the $1,250,000 fee paid to Goldman Sachs.  None of FPL's representatives specifically recalled negotiating the fees paid to Andrews & Kurth, LLP, or ABN.  The $1 million amount paid to ABN represented ABN's fee for forming the Salina partnership, arranging the partnership's investments to satisfy FPL's tax planning objectives, and allowing ABN's affiliates to remain in the partnership so that FPL could pursue its short-term investment objectives.

FPL did not deduct the fees that it paid to ABN, Goldman Sachs, and Andrews & Kurth, LLP on its 1992 tax return, nor did it include the amount of these fees in its Salina capital account. The parties agree that FPL's adjusted basis in Salina as of December 28, 1992, should be increased by the amount of these fees.

### D.  Liquidation of Salina's Original Investments

On December 28, 1992, Mr. Silverstein recommended that Salina liquidate its existing investments so that Mr. Silverstein could reinvest the proceeds pursuant to the MAPS investment strategy.  On the same day, Salina provided BEA with written authorization to liquidate its investments.  On December 30, 1992, Mr. Silverstein

closed Salina's short position in Treasury bills by directing the purchase of Treasury bills with a face value of $350 million for a price of $344,675,333. On December 31, 1992, Mr. Silverstein sold Salina's long position in Treasury notes for $140,408,750 and repaid Goldman Sachs approximately $70 million representing the amount borrowed under the Salina/Goldman Sachs repo agreement. The proceeds of these transactions were held in bank deposits pending Mr. Silverstein's reinvestment of those amounts under the MAPS strategy after January 1, 1993. For financial reporting purposes, Salina realized a book gain of $334,214 for the period December 17 through 31, 1992.

E.  Salina's Investments (January 1993 - November 1994)

After January 1, 1993, Mr. Silverstein actively managed Salina's investments pursuant to the MAPS strategy. Mr. Silverstein executed approximately 2,000 trades on behalf of Salina between January 1, 1993, and November 30, 1994, earning management fees of approximately $1,500,000 in the process.

During the period January 1993 to November 1994, BEA prepared monthly transaction and performance summaries detailing all of Salina's transactions for the particular month. In addition, Mr. Silverstein routinely communicated with Salina's partners in order to apprise them of market developments and BEA's strategy.

Salina conducted regular partnership meetings attended by representatives of FPL, Caraville, and Pallico. At Salina's August

26, 1993 partnership meeting, the partners decided to direct BEA to decrease the leverage in Salina's portfolio in order to reduce the partnership's level of risk.

During 1993, Salina earned a gross return of approximately 10 percent under the MAPS strategy. After paying BEA's fee, Caraville's management fee, and other partnership fees, Salina's net return was approximately 8 percent.

During 1994, the MAPS strategy was hindered by rising interest rates. During 1994, Salina had no earnings under the MAPS strategy.

### F.  Salina's Termination and Liquidation

On November 22, 1994, FPL requested that Caraville liquidate Salina. Accordingly, on November 30, 1994, Salina was liquidated, and its assets were distributed to its partners. FPL received a total distribution of $79,888,748, consisting of $63,175,099 in cash and $16,713,749 in mortgage-backed securities. The record does not reflect the specific amounts distributed to Caraville and Pallico or the ultimate disposition of those distributions.

## IV.  Tax Reporting

### A.  Salina's Partnership Returns

In July 1993, Salina filed a U.S. Partnership Income Tax Return (Form 1065) for the short tax year December 17 to December 27, 1992, reporting investment income of $467,110, investment expenses of $327,812, and unrealized trading profits of $314,526.

In July 1993, Salina filed a Form 1065 for the short tax year December 28 to December 31, 1992, reporting portfolio income of $700,713, investment expenses of $19,469, and a net short-term capital gain of $344,234,365. On Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., attached to the return, Salina allocated $337,343,455 of its short-term capital gain to FPL.

Salina concluded that it realized a $344,234,365 net short-term capital gain following the December 30, 1992, liquidation of its investments based upon a complex set of partnership basis adjustment rules that were purportedly invoked upon FPL's purchase of its 98-percent Salina partnership interest. In particular, relying on sections 708(b)(1)(B) and 732(b), and section 1.708-1(b)(1)(iv), Income Tax Regs., Salina concluded that upon FPL's acquisition of its 98-percent partnership interest on December 28, 1992, (1) the partnership was deemed terminated, (2) the partnership's assets (consisting of $140 million in 2-year Treasury notes and a $344,575,000 loan receivable due from ABN pursuant to the Salina/ABN master repurchase agreement) were deemed distributed in pro rata shares to the new Salina partners, and (3) those assets were deemed recontributed to the partnership with a substituted basis equal to the aggregate of the partners' outside bases. Relying on the aforementioned statutory and regulatory provisions, Salina determined that its substituted basis (from its partners) in its assets was less than the fair market value of the assets in the

hands of the partnership. Upon liquidation of its investments on December 30, 1992, Salina concluded that it realized a $337,343,455 short-term capital gain, representing the difference between Salina's purported substituted basis in its assets and their fair market value.

Salina filed a Form 1065 for 1993 reporting income of $6,177,300. FPL's distributive share of Salina's 1993 net income was $6,053,754. Salina filed a Form 1065 for 1994 reporting a loss of $12,163.

B. FPL's 1992 Income Tax Return

On its original 1992 consolidated income tax return, FPL reported a $337,343,455 capital gain attributable to its distributive share of the capital gain that Salina purportedly realized upon the liquidation of its investments on December 30, 1992. FPL offset a substantial portion of the aforementioned capital gain by reporting a loss carryover attributable to its 1991 sale of CPG. After accounting for the loss carryover, FPL reported and paid additional income tax of $5,904,046 (attributable to its Salina investment) on its 1992 income tax return.

In May 1993, FPL filed an amended return for 1992 reporting an increase in the amount of its CPG loss available for carryover from 1991 and claiming a refund of $5,904,046. FPL claimed that it was entitled to a greater loss carryover from 1991 on the ground that

the loss disallowance rules prescribed in section 1.1502-20, Income Tax Regs., are invalid.

After reporting $337,343,455 as its distributive share of Salina's net short-term capital gain for the period December 28 through 31, 1992, FPL added that amount to its original capital investment in Salina ($73,890,327) to arrive at a total outside basis in the partnership of $411,804,596. FPL later adjusted its basis to account for its distributive share of Salina's items of income and expense for the taxable years 1993 and 1994, as well as the value of the cash and mortgaged-backed securities that Salina distributed to FPL in liquidation of its interest in November 1994. As of November 30, 1994, FPL claimed an adjusted tax basis in Salina of $339,631,665, which it allocated to the mortgage-backed securities. As FPL received payments on the mortgage-backed securities during 1994, 1995, 1996, and 1997, FPL reported ordinary losses (determined by computing the excess of its basis in those assets over the amount realized) in the amounts of $1,101,833, $14,107,759, $212,280,777, and $112,000,000, respectively.

## V. FPAA

As previously stated, respondent issued an FPAA setting forth adjustments to Salina's partnership return for the period ending December 31, 1992. Relying on alternative theories, respondent disallowed $343,900,151 of the $344,234,365 net short-term capital gain that Salina reported for the taxable year ending December 31,

1992, leaving a corrected net short-term capital gain of $334,214. Petitioner filed a timely petition for readjustment contesting the FPAA.

OPINION

Salina computed its short-term capital gain for its taxable year ended December 31, 1992, pursuant to a complex set of tax basis adjustment provisions contained in subchapter K, Partners and Partnerships, of subtitle A of the Internal Revenue Code (the Code). We begin our analysis with a review of the statutory provisions in question.

Pursuant to sections 701 and 702, a partnership is treated as a flow-through entity for purposes of Federal income taxation. See United States v. Basye, 410 U.S. 441, 448 (1973); Brannen v. Commissioner, 722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). As such, a partnership's items of income, gain, loss, deduction, and credit pass through the entity to its individual partners. Consequently, although respondent adjusted Salina's partnership return by substantially reducing the amount of the net short-term capital gain reported for the period ended December 31, 1992, the ultimate impact of this adjustment is to substantially reduce FPL's distributive share of the gain, which in turn nearly eliminates the ordinary losses that FPL reported on its tax returns for 1994, 1995, 1996, and 1997.

Section 706(c)(1) provides the general rule that a partnership's taxable year shall not close upon the sale or exchange of a partner's interest in the partnership except, among other events, in the case of a termination of the partnership. Section 708(b)(1)(B) provides that a partnership shall be considered terminated if, within a 12-month period, there is a sale or exchange of 50 percent or more of the total interest in the partnership's capital and profits. See P.D.B. Sports, Ltd. v. Commissioner, 109 T.C. 423, 431-432 (1997). Relying upon section 708(b)(1)(B), Salina concluded that FPL's purchase of a 98-percent partnership interest caused a technical termination of the partnership on December 27, 1992.

The regulations underlying section 708 provide special rules governing the deemed distribution of partnership assets in the event of a partnership termination. Specifically, section 1.708-1(b)(1)(iv), Income Tax Regs., provides in pertinent part:

> (iv) If a partnership is terminated by a sale or exchange of an interest, the following is deemed to occur: The partnership distributes its properties to the purchaser and the other remaining partners in proportion to their respective interests in the partnership properties; and, immediately thereafter, the purchaser and the other remaining partners contribute the properties to a new partnership, either for the continuation of the business or for its dissolution and winding up.

Following a deemed distribution pursuant to section 1.708-1(b)(1)(iv), Income Tax Regs., section 732(b) provides:

SEC. 732(b).  Distributions in Liquidation.--

   The basis of property (other than money) distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.

Pursuant to sections 732 and 723, upon the recontribution of the property back to the partnership, the partnership's substituted basis in the property is equal to the adjusted basis of the property in the hands of the contributing partner.

Based upon these provisions, Salina concluded that its assets were deemed distributed to FPL, Caraville, and Pallico, and, immediately thereafter, deemed recontributed to the partnership with bases equal to the partners' outside bases in the partnership. Respondent determined that Salina is not entitled to rely upon the provisions outlined above, citing several alternative grounds.

1.  Economic Substance

Respondent first contends that FPL's investment in Salina during the period December 28 through 31, 1992, should be disregarded for tax purposes as a sham in substance.  In so arguing, respondent asserts that the Court should segregate FPL's investment in Salina into two parts:  (1) FPL's investment in Salina during the period December 28 through 31, 1992, and (2) FPL's investment in Salina during the period January 1, 1993, through the dissolution and liquidation of the partnership in November 1994.  Although respondent concedes that FPL had a valid

business purpose for investing in Salina during the latter period, respondent contends that FPL's entry into the partnership was structured solely to provide the company with a perceived tax benefit. Respondent argues in pertinent part:

> In effect, there were two partnerships as a matter of economic substance. The first partnership's destiny was to accomplish a specific tax purpose in its predetermined life span of 48 hours. This partnership is an economic sham. In contrast, the second partnership had the legitimate role of implementing Mr. Silverstein's investment strategy commencing on January 1, 1993. The economic substance of this partnership is not disputed.

Respondent contends that Goldman Sachs, fully aware that FPL had incurred a large capital loss on the sale of CPG, arranged for ABN to form Salina and orchestrated Salina's $350 million short position in Treasury bills so that, following FPL's investment in the partnership and the immediate liquidation of the partnership's investments, Salina would realize a substantial (paper) capital gain. Continuing, respondent maintains that FPL would be able to use its CPG capital loss carryover to offset its distributive share of the Salina capital gain while simultaneously creating an equivalent built-in loss in its Salina partnership interest--a loss that FPL would be able to realize at will through its control of Salina. In this regard, respondent maintains that FPL improperly used its investment in Salina to avoid the 5-year limitation on the use of loss carryovers set forth in section 1212(a).

Respondent argues that FPL's investment in Salina during the initial investment period lacked economic substance because FPL had

no intention to profit from Salina's investments under the STAMPS strategy inasmuch as FPL always intended for those investments to be immediately liquidated and reinvested under the MAPS strategy. Respondent further asserts that (1) there is no evidence of significant negotiations between FPL and ABN prior to FPL's investment in Salina, and (2) the $2.25 million in fees paid to Goldman Sachs and ABN are nothing more than fees for the perceived tax benefits underlying the transaction.

Petitioner counters by claiming that Salina was formed and operated as a legitimate investment partnership and that FPL invested in Salina solely to enhance the returns on its short-term investments. Petitioner maintains that, although FPL understood that Salina would realize a substantial capital gain upon the liquidation of its investments in late 1992, FPL viewed any such transaction as tax neutral insofar as FPL had a large capital loss carryover (the CPG loss) to offset any gain.

It is well settled that taxpayers generally are free to structure their business transactions as they please, even if motivated by tax avoidance considerations. See Gregory v. Helvering, 293 U.S. 465, 469 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. in part, revd. in part, and remanded 752 F.2d 89 (4th Cir. 1985). However, to be accorded recognition for tax purposes, a transaction generally is expected to have "economic substance which is compelled or

encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978); see Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 278 (1999). This principle, which finds its origin in Gregory v. Helvering, supra, is better known as the "economic substance doctrine".

"A sham transaction is one which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits." Karr v. Commissioner, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), affg. Smith v. Commissioner, 93 T.C. 378 (1989). An evaluation whether a transaction is a substantive sham generally requires: (1) A subjective inquiry whether the transaction was carried out for a valid business purpose independent of tax benefits, and (2) a review of the objective economic effect of the transaction. See Karr v. Commissioner, supra at 1023; Kirchman v. Commissioner, 862 F.2d 1486, 1490-1491 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); see also ACM Partnership v. Commissioner, 157 F.3d 231, 247-248 (3d Cir. 1998), affg. in part and revg. in part on another ground T.C. Memo. 1997-115; Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. in part, revg. and remanding in part on another ground Larsen v. Commissioner, 89 T.C. 1229 (1987), affg. T.C. Memo. 1987-628, affg. Sturm v. Commissioner, T.C. Memo. 1987-625, and affg. Moore

v. Commissioner, T.C. Memo. 1987-626; Rose v. Commissioner, 868 F.2d 851, 853-854 (6th Cir. 1989), affg. 88 T.C. 386 (1987). Only after we conclude that a transaction is not an economic sham do we review the tax consequences of the transaction under the Code. See ACM Partnership v. Commissioner, T.C. Memo. 1997-115, affd. in part and revd. in part on another ground 157 F.3d 231 (3d Cir. 1998).

A taxpayer may establish that a transaction was entered into for a valid business purpose if the transaction is "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and * * * economic situation." Compaq Computer Corp. & Subs. v. Commissioner, 113 T.C. 214, 224 (1999) (citing ACM Partnership v. Commissioner, supra); see Kirchman v. Commissioner, supra at 1490-1491. A taxpayer may establish that a transaction has objective economic consequences where the transaction appreciably affects the taxpayer's beneficial interest. See Knetsch v. United States, 364 U.S. 361, 366 (1960) (quoting Gilbert v. Commissioner, 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting)); see also ACM Partnership v. Commissioner, 157 F.3d at 248; Northern Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 512 (7th Cir. 1997), affg. 105 T.C. 341 (1995). Stated differently, a transaction has economic substance if it offers a reasonable opportunity for profit exclusive of tax benefits. See Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986), and cases cited therein. Generally, there must be a reasonable expectation that

nontax benefits will meet or exceed transaction costs.  See Yosha v. Commissioner, 861 F.2d 494, 498 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986).  Modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance.  See Sheldon v. Commissioner, 94 T.C. 738, 767-768 (1990); Saba Partnership v. Commissioner, T.C. Memo. 1999-359.

Contrary to respondent's position, we decline to analyze the economic substance of the disputed transaction by focusing solely on events occurring during the period December 28 through 31, 1992. Segregating FPL's investment in Salina into two parts, as respondent suggests, would violate the principle that the economic substance of a transaction turns on a review of the entire transaction.  See Kirchman v. Commissioner, supra at 1493-1494; Winn-Dixie Stores, Inc. v. Commissioner, supra at 280.  Although we agree with respondent that Goldman Sachs structured FPL's purchase of the Salina partnership interest to provide FPL with a perceived tax benefit, this factor, standing alone, is insufficient to render the transaction a sham in substance.

Considering all the facts and circumstances, we conclude that FPL entered into the Salina transaction to achieve a valid business purpose independent of tax benefits.  The record demonstrates that FPL entered into the Salina partnership for the primary purpose of enhancing the return on its short-term investments.  Each of FPL's

representatives testified convincingly on this point. Moreover, their testimony was bolstered by their detailed review and consideration of the proposed investment and the minutes of the board of director's meeting approving the investment.[6]

We need not dwell on respondent's contention that FPL failed to evaluate fully the STAMPS investment strategy. We are convinced that FPL evaluated the STAMPS strategy in sufficient detail to determine that the strategy presented greater market risk than it was willing to accept. FPL invested in Salina on the condition that Salina's STAMPS portfolio would be promptly liquidated and reinvested under the MAPS strategy. There is no dispute that FPL carefully evaluated the potential risks and rewards of the MAPS strategy. FPL's "due diligence" included two meetings with Mr. Silverstein. Moreover, at FPL's request, Mr. Silverstein presented FPL with several analyses of the financial risks and rewards associated with the MAPS investment strategy under a variety of economic scenarios.

We are convinced that FPL's investment in Salina provided a reasonable opportunity for FPL to earn profits independent of tax benefits. As previously discussed, FPL carefully evaluated the potential risks and rewards of the MAPS strategy. Mr. Silverstein

---

[6] Although the minutes also mention a potential tax benefit associated with the investment, we infer that FPL did not consider the tax benefit to be paramount to the transaction, rather merely ancillary or collateral thereto.

projected that under normal market conditions, the MAPS strategy would allow FPL to earn between 4 and 7 percent over Treasury bills which were then yielding approximately 3 percent. In fact, respondent concedes that Mr. Silverstein's projections were reasonable.

Relying upon Sheldon v. Commissioner, supra, and Saba v. Commissioner, supra, respondent contends that the transaction lacked economic substance on the ground that FPL's potential profits were de minimis when compared with the potential tax benefit. In particular, respondent reasons that while FPL stood to earn approximately $5.3 million annually on its investment, the transaction provided the potential for FPL to save up to $118.8 million in taxes. Respondent's computation of $118.8 million is based upon the assumption that FPL would have been unable to use any of its CPG loss during the applicable 5-year loss carryover period prescribed in section 1212(a)(1)(C).

Respondent's view of the potential tax benefit associated with FPL's Salina investment is significantly inflated. The record reveals that FPL was in the process of restructuring its operations by selling noncore businesses in order to concentrate on its utility businesses. FPL's sale of CPG was undertaken as part of this restructuring. We are convinced that, as of late 1992, FPL reasonably anticipated that it would realize substantial capital gains over the next several years on the sale of various

subsidiaries (including Telesat, Alandco, Turner Foods, and a separate banking business). On the basis of the record presented, we conclude that FPL would have used most, if not all, of its CPG loss within the 5-year period for reporting loss carryovers under section 1212(a). Accordingly, although we shall not attempt to precisely quantify the potential value of the tax benefit associated with FPL's investment in Salina, we are satisfied that the potential profits associated with the investment were not de minimis relative to the perceived tax benefit.

## 2. Section 752

Having concluded that FPL's investment in the Salina partnership was not a sham in substance, we now review the disputed transaction on its merits. Respondent maintains that Salina substantially overstated the amount of its short-term capital gain by failing to treat its obligation to return the Treasury bills that it sold short as a "liability" under section 752(a).

Section 752(a) provides:

SEC. 752. Treatment of Certain Liabilities.--

(a) Increase In Partner's Liabilities.--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

Assuming that Salina's obligation to close its short sale constituted a partnership liability under section 752, respondent posits that FPL's pro rata share of the liability would have

increased FPL's outside basis in its partnership interest, thereby increasing Salina's substituted basis in its assets following the deemed termination of the partnership pursuant to section 1.708-1(b)(1)(iv), Income Tax Regs. Such an increase in Salina's substituted basis would have virtually eliminated the short-term capital gain that Salina reported following the closing of its short position.

Respondent relies upon Rev. Rul. 88-77, 1988-2 C.B. 128, and the preamble to section 1.752-1T, Temporary Income Tax Regs., 53 Fed. Reg. 53143 (Dec. 30, 1988), in support of the proposition that Salina's obligation to close out its short sale (by returning Treasury bills to ABN and Goldman Sachs) represents a partnership

liability within the meaning of section 752.[7] Although acknowledging that Salina's obligation to replace the borrowed securities was secured under the Salina/ABN master repurchase agreement (under which Salina lent $343,875,000 to ABN and ABN collateralized its loan with the Treasury bills that Salina sold short), respondent asserts that Salina incurred an obligation in the amount of $344 million that should be considered a liability under section 752(a).

The various provisions of subchapter K of the Code blend two approaches, the entity and the aggregate approaches, for taxation of partnerships and partners. See Coggin Automotive Corp. v. Commissioner, 115 T.C. ___ (2000) (slip. op. at 21); see also S. Rept. 1622, at 89-100, 83d Cong., 2d Sess. (1954). The entity

---

[7] The portion of the preamble to sec. 1.752-1T, Temporary Income Tax Regs., 53 Fed. Reg. 53143 (Dec. 30, 1988), that respondent relies upon states in pertinent part:

> The allocation of partnership liabilities among the partners serves to equalize the partnership's basis in its assets ("inside basis") with the partners' bases in their partnership interests ("outside basis"). The provision of additional basis to a partner for the partner's partnership interest will permit the partner to receive distributions of the proceeds of partnership liabilities without recognizing gain under section 731, and to take deductions attributable to partnership liabilities without limitation under section 704(d) (which limits the losses that a partner may claim to the basis of the partner's interest in the partnership). By equalizing inside and outside basis, section 752 simulates the tax consequences that the partners would realize if they owned undivided interests in the partnership's assets, thereby treating the partnership as an aggregate of its partners. [T.D. 8237, 1989-1 C.B. 180, 182.]

approach, which recognizes a partnership as an entity separate and distinct from its partners, is reflected in part in section 703(a), which provides that items of income, gain, loss, deduction, and credit are determined at the entity or partnership level. The aggregate approach, which recognizes a partnership as an aggregate of its partners, is reflected through provisions such as sections 701 and 702, which provide that partnership items are passed through the partnership to its individual partners for purposes of imposing income tax. See United States v. Basye, 410 U.S. 441, 448 (1973).

In an effort to avoid distortions in income tax reporting associated with the blending of the entity and aggregate approaches within subchapter K, Congress enacted a number of provisions that generally are intended to equate the aggregate of the partnership's inside bases in its assets with the aggregate of its partners' outside bases in their partnership interests. See 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 6.01, at 6-3 (3d ed. 1997) (McKee). The carryover-basis rules contained in section 722, which provide that a partner's basis in his partnership interest equals the amount of money plus the adjusted basis of property contributed to a partnership, generally results in a matching of inside and outside bases upon the formation of a partnership. See Coloman v. Commissioner, 540 F.2d 427, 429 (5th Cir. 1976), affg. T.C. Memo. 1974-78. Similarly, adjustments to basis prescribed under section 705(a) to account for income and

expenses from partnership operations generally preserve the balance between inside and outside bases. See id. Finally, section 752 prescribes bases adjustments to reflect increases and decreases in a partner's share of partnership liabilities. See LaRue v. Commissioner, 90 T.C. 465, 477 (1988).

Under section 752(a), an increase in a partner's share of partnership liabilities is considered a contribution of money, which results in an increase in the partner's basis in his partnership interest. See sec. 1.752-1(b), Income Tax Regs.[8] The practical impact of the basis adjustment prescribed in section 752(a) has been described as follows:

> If a partnership borrows money, the basis of its assets increases by the amount of cash received, even though the receipt of the borrowed funds is not income. By treating the partners as contributing cash in an amount equal to their shares of the debt, inside/outside basis equality is preserved and distortions are avoided. If a liability for borrowed money were not added to the partners' bases, they could be taxed on a distribution of the borrowed cash even though there is no gain inherent in the partnership's assets. A similar result could occur if a partnership incurs a purchase money liability to acquire property, since the liability is added to the partnership's basis in the property.

McKee, supra, par. 7.01[1], at 7-2; see Laney v. Commissioner, 674 F.2d 342, 345-346 (5th Cir. 1982), affg. in part and revg. in part on another ground T.C. Memo. 1979-491.

In the instant case, the parties disagree whether Salina's

---

[8]  On the other hand, sec. 752(b) provides that a decrease in a partner's share of partnership liabilities is considered a distribution of cash to the partner, which results in a decrease in the partner's outside basis in his partnership interest.

obligation to close out its short sale transaction by returning the Treasury bills that it borrowed from ABN and Goldman Sachs represents a liability within the meaning of section 752. Resolution of this issue is complicated by the lack of a definition of "liabilities" within subchapter K or the underlying regulations. Although the Commissioner has not adopted a definition of the term "liabilities" within the controlling regulations, the Commissioner has addressed the subject in earlier temporary regulations and revenue rulings.

In Rev. Rul. 88-77, 1988-2 C.B. 128, the Commissioner revoked Rev. Rul. 60-345, 1960-2 C.B. 211, and concluded that accrued but unpaid partnership expenses and accounts payable (obligations that arguably would satisfy the plain meaning of "liabilities") are not liabilities within the meaning of section 752 for purposes of computing the adjusted basis of a partner's interest in a partnership using the cash method of accounting.[9] In so concluding, the Commissioner drew an analogy to the computation of a shareholder's basis under section 357(c)(3) when a shareholder contributes property and liabilities to a controlled corporation in

---

[9] In Rev. Rul. 60-345, 1960-2 C.B. 211, the Commissioner concluded (with no analysis) that, in computing the adjusted basis of a partner's interest in a partnership using the cash method of accounting, for purposes of determining the extent to which the partner would be allowed a deduction for his distributive share of the partnership's loss for the year pursuant to sec. 704(d), the term "liabilities" under sec. 752 includes the partnership's obligation to pay outstanding trade accounts, notes, and accrued expenses.

exchange for stock. The Commissioner noted that Congress had provided that a shareholder's basis generally is not increased by liabilities, the payment of which would give rise to a deduction, except for liabilities the incurrence of which resulted in the creation of, or an increase in, the basis of any property.[10] The Commissioner also found it significant that, in amending section 704(c) under the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 71(a), 98 Stat. 494, Congress expressly rejected Rev. Rul. 60-345, supra, stating in the legislative history that "accrued but unpaid items should not be treated as partnership liabilities for purposes of section 752." On the basis of these factors, the Commissioner interpreted section 752 as follows:

> Under P's method of accounting, P's obligations to pay amounts incurred for interest and services are not deductible until paid. For purposes of section 752 of the Code, the terms "liabilities of a partnership" and "partnership liabilities" include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest. [Rev. Rul. 88-77, 1988-2 C.B. 129.]

---

[10] Sec. 357(c) generally provides that a taxpayer who transfers property to a corporation with liabilities in excess of adjusted basis is considered to have realized a gain. Sec. 357(c)(3)(A) generally provides that, for purposes of a sec. 351 exchange, liabilities in excess of adjusted basis are excluded from consideration if the liability would give rise to a deduction or if it would be considered a distributive share or guaranteed payment under sec. 736(a). Sec. 357(c)(3)(B) provides that subparagraph (A) shall not apply to a liability to the extent that the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

A few months after issuing Rev. Rul. 88-77, supra, the Commissioner issued section 1.752-1T(g), Temporary Income Tax Regs., 53 Fed. Reg. 53143, 53150-53151 (Dec. 30, 1988), defining "liability" in pertinent part as follows:

> (g) Liability defined.--Except as otherwise provided in the regulations under section 752, an obligation is a liability of the obligor of purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to--
>
> > (1) The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
> >
> > (2) A deduction that is taken into account in computing the taxable income of the obligor; or
> >
> > (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.

For reasons that are unclear, the final regulations under section 752 do not contain a definition of the term "liabilities". See sec. 1.752-1, Income Tax Regs.

In Rev. Rul. 95-26, 1995-1 C.B. 131, the Commissioner addressed the question presented herein: Whether a partnership's short sale of securities creates a liability within the meaning of section 752. The revenue ruling states that a partnership entered into a short sale of securities on a national securities exchange. The partnership's broker-dealer took securities on hand and sold them on behalf of the partnership. The partnership left the cash

proceeds from the sale with the broker-dealer as collateral and deposited additional cash with the broker-dealer as further collateral.  The partnership was obligated to deliver identical securities to the broker-dealer to close out the short sale.

On these facts, the Commissioner concluded that the short sale created a partnership liability within the meaning of section 752, citing Rev. Rul. 88-77, supra, for the proposition that a liability under section 752 includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets, including cash attributable to borrowings.  The Commissioner reasoned that a short sale creates such a liability inasmuch as:  (1) A short sale creates an obligation to return the borrowed securities, citing Deputy v. du Pont, 308 U.S. 488, 497-498 (1940); and (2) the partnership's basis in its assets is increased by the amount of cash received on the sale of the borrowed securities.  See Rev. Rul. 95-26, supra at 132. Accordingly, the Commissioner concluded that the partners' bases in their partnership interests were increased under section 722 to reflect their shares of the partnership's liability under section 752.

Petitioner first asserts that section 752 is simply inapplicable. In particular, petitioner maintains that the substantial difference between Salina's inside basis in its assets and FPL's outside basis in its partnership interest is dictated by

section 1233 and section 1.1233-(1)(a), Income Tax Regs., which require a short sale to be treated as an "open transaction" for income tax purposes. Because a short sale of securities is treated as an open transaction for income tax purposes, and income recognition is deferred until the transaction is closed with the replacement of the borrowed shares pursuant to section 1233,[11] petitioner reasons that section 705 requires that any adjustments to the partners' outside bases in their partnership interests be deferred until the short sale is closed. In connection with this argument, petitioner contends that the Commissioner's position in Rev. Rul. 95-26, supra, conflicts with Rev. Rul. 73-301, 1973-2 C.B. 216, and the Court's holding in Helmer v. Commissioner, T.C. Memo. 1975-160.

We are not convinced that the treatment of a short sale as an open transaction for income tax purposes under section 1233 is controlling with respect to the proper treatment of the transaction for purposes of the partnership basis adjustment provisions contained in subchapter K. Petitioner's argument overlooks the disparate policies that sections 1233 and 752 are intended to promote. Section 1233 affords open transaction treatment to a short sale, i.e., defers recognition of gain or loss until the

---

[11] A short sale of securities is treated as an open transaction for income tax purposes because the taxpayer's ultimate gain or loss on the transaction cannot be determined until the taxpayer purchases securities to replace those that were borrowed (and sold) in the first leg of the transaction. See sec. 1.1233-1(a), Income Tax Regs.

short sale is closed, to clarify and simplify the tax treatment of a transaction that is something of a hybrid. See Hendricks v. Commissioner, 423 F.2d 485, 486-487 (4th Cir. 1970), affg. 51 T.C. 235 (1968). In contrast, the basis adjustment provisions contained in subchapter K, including sections 705 and 752, are intended to avoid distortions in the tax reporting of partnership items by promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests. For present purposes, we observe that the provisions of sections 1233 and 752 are mutually exclusive. In other words, the conclusion that a partnership's short sale of securities creates a partnership liability within the meaning of section 752 (thereby increasing the partners' outside bases in their partnership interests) does not create tension or conflict with the deferred recognition of gain or loss prescribed for short sale transactions under section 1233.

Further, we are not persuaded that the Commissioner's position in Rev. Rul. 95-26, supra, conflicts with Rev. Rul. 73-301, supra, or the Court's holding in Helmer v. Commissioner, supra. The pertinent facts in Rev. Rul. 73-301, supra, are as follows: During 1971, ABC partnership, which reported its income on the completed contract method, was awarded a 2-year contract for the construction of a building. During 1971, ABC had performed all the services required under the contract in order to be entitled to receive

progress payments totaling $120x.  During 1971, ABC received total

progress payments of $100x and incurred liabilities for total costs

of $80x.  The facts stated in the revenue ruling reveal that the

Commissioner allocated a pro rata share of the $80x liabilities for

costs incurred under the contract to the partners for purposes of

determining their adjusted bases in their partnership interests.

On these facts, the Commissioner framed the issue to be addressed

as whether:

> the deferred income of 100x dollars as of December 31,
> 1971 (representing progress payments on the contract),
> represents "liabilities of a partnership" within the
> meaning of section 752(a) of the Code and, as such,
> additions to basis of the partnership interests of the
> partners.  [Rev. Rul. 73-301, 1973-2 C.B. 216.]

The Commissioner concluded that the progress payments qualified as

"unrealized receivables" under section 751(c), as opposed to

liabilities within the meaning of section 752.  In this regard,

the revenue ruling states that "The income or loss from performance

of the contract will affect the basis of the partnership interests

of the partners, as provided in section 705(a), when such income or

loss is recognized for Federal income tax purposes."  Rev. Rul. 73-

301, supra at 216.  (Emphasis added.)  In sum, the partners were

not  permitted to adjust their outside bases with reference to the

$100x in progress payments that the partnership received during

1971 until income or loss from the transaction would be recognized

for tax purposes.  However, the Commissioner recognized that the

partners were entitled to increase their outside bases by a pro rata share of the $80x of liabilities for construction costs that the partnership incurred in 1971 in generating the progress payments.

In Helmer v. Commissioner, supra, the taxpayers were partners in a partnership that had entered into an agreement granting a third party an option to purchase real estate in which the partnership held a two-thirds interest. During the term of the option agreement, the partnership retained the right to possess and enjoy profits from the property in question, and there was no provision in the option agreement for repayment of the amounts paid under the agreement should the agreement terminate.

During the years in issue, the taxpayers received payments directly from the third party pursuant to the option agreement-- amounts that the partnership listed as distributions to the taxpayers on its books and tax returns. During the years in issue, the taxpayers received partnership distributions, and had the partnership pay personal expenses, in excess of their adjusted bases in the partnership. The Commissioner determined that, although the option payments qualified as deferred income at the partnership level, the taxpayers nevertheless were subject to income tax to the extent that they had received distributions from the partnership in excess of their adjusted bases in their partnership interests. In response, the taxpayers argued that

their adjusted bases in their partnership interests should be increased by their pro rata shares of the option payments, which they characterized as partnership liabilities under section 752.

The Court agreed with the Commissioner that no liability within the meaning of section 752 arose upon the partnership's receipt of the option payments. The Court noted that there were no provisions in the option agreement for repayment of, or restrictions on, the option payments. Further, the Court emphasized that income attributable to the option payments was subject to deferral at the partnership level due only to the inability of the partnership to determine the character of the gain, not because the partnership was subject to a liability to repay the funds paid or to perform any services in the future.

We are not convinced that either Rev. Rul. 73-301, supra, or Helmer v. Commissioner, T.C. Memo. 1975-160, provides a sound basis for determining whether a short sale transaction generates a partnership liability within the meaning of section 752. On the one hand, both authorities stand for the general proposition that amounts owed or paid to a partnership (or its partners) in a transaction that qualifies as an open transaction for tax purposes do not generate adjustments to the partners' outside bases in their partnership interests until the transaction is closed and the tax characteristics of the transaction can be determined. On the other hand, in Rev. Rul. 73-301, supra, the Commissioner recognized that

the partners therein were entitled to immediate adjustments to their outside bases equal to their pro rata shares of the partnership's liabilities for costs incurred in qualifying for the progress payments. Similarly, Helmer v. Commissioner, supra, suggests that a partnership liability under section 752 may arise where a partnership receives payments in a transaction that qualifies as an open transaction for tax purposes if the partnership is subject to a liability to repay the funds or to perform any services in the future. In sum, the authorities that petitioner relies upon demonstrate that, although the amounts received by a partnership in an open transaction generally are not characterized as a liability under section 752, the transaction must nevertheless be examined to determine whether the partnership incurred related liabilities that may require partner-level basis adjustments pursuant to section 752. In light of these competing considerations, we reject petitioner's argument that the Commissioner's reasoning in Rev. Rul. 95-26, 1995-1 C.B. 131, conflicts with Rev. Rul. 73-301, supra, and the Court's holding in Helmer v. Commissioner, supra.

Petitioner attempts to draw an analogy between the option payments that the partnership received in Helmer v. Commissioner, supra, with the cash proceeds that Salina received on its sale of the borrowed Treasury bills. Although the two transactions are both considered open transactions for purposes of application of

the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in Helmer v. Commissioner, supra, represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that Helmer v. Commissioner, supra, does not support petitioner's position in this case.

As an alternative to its "open transaction" argument, petitioner cites Deputy v. du Pont, 308 U.S. 488, 497-498 (1940), for the proposition that Salina's short sale of Treasury bills did not generate a partnership "liability" within the meaning of section 752. Petitioner's reliance on Deputy v. du Pont, supra, is misplaced.

In Deputy v. du Pont, supra, the taxpayer entered into a short sale of securities and agreed to pay to the lender of the securities the dividends paid on the securities during the period that the short sale remained open. The taxpayer claimed the amount that he paid to the lender as a deduction for interest paid or accrued on indebtedness under section 23(b) of the Internal Revenue Code of 1928. The Supreme Court questioned whether the taxpayer's obligation to transfer the dividends to the lender constituted an

indebtedness within the meaning of the statute, stating in pertinent part that "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness'".   Id. at 497. Nevertheless, the Supreme Court's rejection of the taxpayer's argument was more firmly rooted in the Court's holding that the disputed payments did not constitute  a payment of interest within the meaning of the statute.  See Deputy v. du Pont, supra at 498.

Petitioner's interpretation of Deputy v. du Pont, supra, for the proposition that "Salina's short sale obligation" is "not an 'indebtedness' that constitutes a 'liability' under Section 752 of the Code", overstates the Supreme Court's holding in that case.  In the first instance, the Supreme Court's statement in Deputy v. du Pont, supra at 497, that "an obligation is not necessarily an 'indebtedness'", which was directed at the taxpayer's obligation to transfer an amount equivalent to the dividends paid on the borrowed securities to the lender, does not constitute a blanket holding that a borrower's obligation to close a short sale by returning the borrowed securities to the lender will never be considered an indebtedness.  Moreover, petitioner attempts to equate the term "indebtedness", as contemplated under section 23(b) of the Internal Revenue Code of 1928, with the term "liabilities" as used in section 752, without any meaningful analysis or citation to precedent.  We, of course, are in no way constrained (nor prepared)

to assume that a liability within the meaning of section 752 must satisfy the definition of an indebtedness as that term is used elsewhere in the Code.

Although petitioner asserts that Salina's short sale of Treasury bills did not result in a partnership liability within the meaning of section 752, petitioner does not offer the Court a definition of the term "liability" to support its position. As previously indicated, the term "liability" is not defined in either the Code or the Commissioner's final regulations under section 752.[12] In the absence of any indication that Congress intended otherwise, we apply the term taking into account its plain and ordinary meaning. See, e.g., Deputy v. du Pont, supra at 498.

Black's Law Dictionary 925 (7th ed. 1999), defines the term "liability" in pertinent part as follows:

> 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. * * * 2. A financial or pecuniary obligation * * *.

Based upon the aforementioned meaning of the term "liability", and consistent with the policy underlining section 752, we hold that Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the

---

[12] Neither petitioner nor respondent argues that the current regulations provide insight on the question presented.

Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN.  Significantly, Salina reported the obligation as a liability on its opening balance sheet.

Consistent with the preceding discussion, we sustain respondent's adjustment to Salina's tax return inasmuch as Salina's partners were required to increase their outside bases in their partnership interests to reflect their pro rata shares of the aforementioned liability.

A final matter.  Petitioner observes that section 1.708-1(b)(1)(iv), Income Tax Regs., was amended effective May 8, 1997, to eliminate the basis adjustment provision underlying the present dispute.[13]  Because the regulation was amended prospectively, it is of no aid to this Court in deciding the question presented in this case.  See, e.g., Compaq Computer Corp. & Subs. v. Commissioner, 113 T.C. 214, 225-226 (1999).

Under the circumstances, we need not consider the parties' remaining arguments.  To reflect the foregoing, and the agreement of the parties, see supra note 2,

Decision will be entered

---

[13]  Pursuant to an amendment to sec. 1.708-1(b)(1)(iv), Income Tax Regs., effective May 8, 1997, constructive partnership terminations are no longer treated as deemed distributions of partnership assets.  Pursuant to the amendment, the new partnership is now required to take a carryover basis from the old partnership.

<u>under Rule 155</u>.